## THE DANUBE.

### UNITED STATES v. THE DANUBE et al.

#### (District Court, D. Oregon. May 12, 1893.)

#### No. 3,306.

SHIPPING—EMIGRANT PASSENGERS—CONTIGUOUS TERRITORY.

Under the act of congress of August 2, 1882, prohibiting the carrying of "emigrant passengers" from any port or place in a foreign country, except ports and places "in foreign territory contiguous to the United States," unless the spaces and accommodations therein mentioned be provided, Vancouver's island, B. C., is territory contiguous to the United States, and the transportation of passengers therefrom to Astoria, Or., is within the exception.

In Admiralty. Action by the United States against the steamship Danube and William Meyers, her master, for penalties for a

violation of the act of congress to regulate the carriage of passengers by sea. On exceptions to the libel. Exceptions allowed.

Franklin P. Mays, for libelant.

Cyrus A. Dolph and E. C. Hughes, for claimant.

BELLINGER, District Judge. This is an action by the United States for penalties aggregating $19,660 for a violation of the provisions of the act of August 2, 1882, to regulate the carriage of passengers by sea. Chapter 374, Supp. Rev. St. The libel alleges:

"That on the —— day of March, 1893, the steamship The Empress of Japan left Hong Kong, China, with, among other passengers, about 630 Chinese, destined for Portland, Oregon. That said vessel, about the —— day of May, 1893; arrived at Vancouver's island, B. C., and there said Chinese passengers were ordered and placed in quarantine on said island, and so remained in quarantine for twenty-one days, at the end of which time 612 of said Chinese were placed upon the steamship Danube, one of the defendants above named, and of which the other defendant above named, William Meyers, was the master. That, after said Chinamen were so placed on said steamship Danube, the said master proceeded at once with said vessel, by way of Astoria, Oregon, to Portland, Oregon, where said vessel was seized as aforesaid. That all of said 612 Chinamen were so carried on said steamship Danube from said Vancouver's island into the United States by way of Astoria, Oregon, and that none of said 612 Chinamen were cabin passengers. That the entire space upon said vessel which was subject to be or could be used for and by said 612 Chinamen, was 32,588 cubic feet, of which 14,617 cubic feet was on the first deck below the main deck, and 17,471 cubic feet was on the second deck below the main deck; in which aggregate space was also placed a large amount of baggage of said Chinamen. That all of said Chinamen were above the age of twelve years. That by reason of all and singular the premises aforesaid, and by force of the statute in such case made and provided, the said vessel on the said trip carried 312 Chinamen in excess of the number which she was entitled to carry, and the said master and vessel became and are each liable to a penalty of $50 for each of said 312 persons, and said steamship Danube thereby became and was and is holden for such aggregate penalty of $15,600."

The libel alleges as further violations of the provisions of the act in question that such steamship was without berths for use by such passengers; that it did not have adequate provisions for affording light and air to such passengers; that the master provided neither tables nor seats for their use; and that there were no hospital compartments or surgeon or medical practitioner provided during such trip from Vancouver's island to Astoria.

To this libel William Meyers, claimant, excepts, upon the ground that it affirmatively appears that the passengers taken on the steamer Danube were so taken at a foreign port or territory contiguous to the United States, and that the case is therefore within the provision that excepts transportation of passengers from such ports from the operation of the act. The language of the act is:

"That it shall not be lawful for the master of a steamship or other vessel whereon emigrant passengers, or passengers other than cabin passengers, have been taken at any port or place in a foreign country or dominion, (ports and places in foreign territory contiguous to the United States excepted,) to bring such vessels and passengers to any port or place in the United States unless the compartments, spaces, and accommodations hereinafter mentioned have been provided," etc.

The question, therefore, is whether Vancouver's island is territory contiguous to the United States. The word "territory," as generally used, describes a jurisdiction,—a district of country. Thus we speak of the territories of the United States, of the Northwest territory, of the territory of Alaska. The word refers to a jurisdiction. It is not limited, when speaking of any particular district as "territory," to the line of high-water mark along the shores of navigable rivers or bays or straits. The territory of a jurisdiction or country extends to its boundaries. It describes the possessions of a country. The straits of Rosario, the waters of Puget sound, are American territory. The treaty of 1846 between Great Britain and the United States, and the protocol of a conference of the representatives of the two governments held on March 10, 1873, define a precise boundary line between the possessions of the two governments in respect to the point in question. There had, prior to this conference, been disagreement as to whether the boundary ran through the Rosario straits, as claimed by Great Britain, or to the west through the Canal de Haro, as claimed by the United States. The dispute having been submitted to the arbitrament of the emperor of Germany, and his award being favorable to the latter claim, the line was laid down accordingly in the protocol referred to. By this agreement Rosario straits became American "territory," the line of which was located substantially in the middle of the channel of the Canal de Haro and the Straits of Fuca. The word "territory," when used to define the possessions of the two countries, must be understood as extending to this boundary, and these possessions as contiguous territory, within the meaning of the law. The reason for this legislation is obvious. It was to guard against the mischief of overcrowding emigrant passengers. The act is restricted to "emigrant passengers," or, what amounts to the same thing, "passengers other than cabin passengers." It is common knowledge that the great bulk of emigrant travel from foreign territory is transatlantic. The conditions of this travel are such that emigrant passengers are exposed to the danger of overcrowding,—a danger that is aggravated by the length of the voyage, but that does not exist with reference to short and coastwise lines of travel. Section 12 extends the provisions of the act to vessels whereon passengers are taken on board at any port or place "of the United States on the Atlantic ocean or its tributaries for conveyance to a port or place on the Pacific ocean or its tributaries, or vice versa, and whether the voyage of said vessel is to be continuous from port to port, or such passengers are to be conveyed from port to port in part by way of any overland route through Mexico or Central America." Under this provision protection is afforded to passengers by water routes between American ports on the Atlantic and Pacific oceans. So the question of jurisdiction was not a controlling consideration with the framers of this law. It is not important that ventilation and bunks and hospital stores and medical practitioners be provided

for the voyage of 10 miles from Victoria to Port Angeles or Port Townsend, but these are important provisions for passengers sailing from New York for San Francisco or Portland via the isthmus or otherwise. This is a carriage of passengers to this port from a foreign territory contiguous to the United States, and belongs to the class of cases excepted from the statute.

The exceptions to the libel are allowed.